H. S. CHASE AND COMPANY, Appellant, v. ROBERT J. FLEMING and others, Appellees.

**Landlord and tenant:** CANCELLATION OF LEASE: TOTAL OR SUBSTANTIAL DESTRUCTION OF PROPERTY: CONSTRUCTION OF TERMS. Under a lease covering a lot and building thereon as then existing, the right of the lessors to cancel the lease under a provision giving them such power in case the building be "totally or substantially destroyed," absolute annihilation of the building is not essential to an exercise of the right; but if the damage is so complete as to render it untenantable and its restoration in practical effect the construction of a new building rather than a repair of the old one, there is a substantial if not total destruction, within the terms of the agreement.

*Appeal from Polk District Court.*—HON. JAMES A. HOWE, Judge.

FRIDAY, JULY 2, 1909.

The opinion states the material facts.—*Affirmed.*

*Clinton L. Nourse* and *Schenck & Berryhill,* for appellant.

*N. T. Guernsey,* for appellees.

WEAVER, J.—On July 1, 1902, the trustees of the estate of James Rothwell, deceased, holding the title to the east half of lots 7 and 8, block 11, of the original town plat of Ft. Des Moines, leased the same to H. S. Chase &

Co. for a term of ten years upon certain terms and conditions hereinafter more particularly mentioned. The property is favorably located for business purposes, and at the date of the lease had upon it a brick building sixty-six feet in width and three stories in height above the basement. The building was fitted and arranged for use as stores, offices and shops, from the rent of which a very considerable income could be derived. The lease is in writing, and, after fixing the amount of rent to be paid to the lessors and manner of its payment, proceeds to stipulate, among other things, that the lessees shall keep the premises in repair "reasonable use and wearing thereof and damage by fire and other unavoidable casualties alone excepted.". It was also further provided as follows:

But it is agreed that in case the buildings on said premises or any part thereof shall be damaged by fire or other unavoidable casualty, so that the same shall be thereby rendered unfit for use and occupation, then and in such case the rent hereinbefore reserved, or a just and proportional part thereof, according to the extent and nature of the injury sustained, shall be abated until the said premises shall have been duly repaired and restored by the lessors or their successors or assigns; or in case the said buildings shall be totally or substantially destroyed, then at the election of the lessors or their successors or assigns, the estate hereby created may thereupon be determined, the trustees to give the lessee notice of such election by letter mailed to the lessee within fifteen days from the date of such fire.

As will be seen in the further development of the case, the controversy now before us turns upon the proper construction and application of this clause of the contract. On December 15, 1905, a fire occurred in the leased building, and soon thereafter the defendants herein who had purchased the property subject to the lease made claim that said building was totally or substantially destroyed within the meaning of the terms of said agreement, and gave

written notice to the plaintiff of their election to cancel
the lease, and determine the estate thereby created. This
position was contested by plaintiff, who demanded that de-
fendants proceed without unreasonable delay to repair and
restore the building to a tenantable condition. The defend-
ants, insisting upon the cancellation of the lease, began to
tear down the walls of the burned structure preparatory
to the erection of a large office building upon the same site.
Thereupon this action was begun in equity to restrain the
defendants from carrying out their declared intention, and
asking a decree requiring them to repair and restore the
original building to a tenantable. condition for the use of
the plaintiff, or, in the event of their refusal so to do, that
plaintiff be allowed to make the necessary repairs at de-
fendants' expense. On hearing therefor before the trial
court a temporary injunction was denied, and, pending the
final hearing, defendants removed the remnant of the old
building, and erected upon its site a large and expensive
office building of eleven stories. Thereafter plaintiff
amended its petition, asking that defendants be required to
specifically perform the contract of lease and surrender
possession of the premises to the plaintiff, or, in case the
court finds the contract can not be specifically enforced,
then that plaintiff's damages may be assessed. Defendants
ground their defense upon the single proposition of fact
that the building was totally or substantially destroyed by
the fire—thus affording them just occasion for the exercise
of the right of cancellation reserved to them in the lease.
After a protracted trial in which a large number of wit-
nesses were examined, the district court found for the de-
fendants, and the plaintiff appeals.

I. It is apparent from the foregoing statement that
the conclusion to be reached on the matters in dispute
depends very largely upon the definition or construction to
be given to the words "totally or substantially destroyed"
as used in the lease. In this connection it is well to keep

in mind the situation of the parties and the subject-matter of their negotiations. The lessee was bargaining, not for a mass of materials out of which a building might be erected, nor for a building site which the lessors were bound to improve with a new building. The thing leased was a lot on which was a definite existent structure subject to the reserved right in the lessors to cancel the lease in the event of the total or substantial destruction of said structure by fire or other casualty. We think it very clear that the words "total or substantial destruction" do not import the idea of annihilation, but rather an effective destruction of the building as such. In other words, although there remain substantial parts or elements of the building some or all of which could be used in restoring it to its original condition, yet, if the injury is so complete as to render it entirely untenantable and the restoration of it is in practical effect the construction of a new building rather than a mere repair of the old one, then it is destroyed "substantially," if not "totally," within the meaning of the agreement. Stated otherwise, the subject of the treaty was the specific organized thing which we call a building, and it was the destruction of that thing for the practical uses for which it was erected, and not the destruction of all the materials or all the parts comprising it, which would justify a cancellation of the lease. The question of restoration or repair depends, also, in some degree upon its wisdom or practicability as a business proposition. The inquiry is not satisfied by a mere showing that the restoration of the building incorporating the original foundation and walls is possible, but the question of the expense to be thus incurred in comparison with the construction of a new building with new materials, and a consideration of the value, safety and desirability of the repaired or restored building as compared with a new one of like plan and proportions, are matters which the lessors are not required to ignore in reaching their conclusion. With this under-

standing of the terms of the contract, we have to inquire whether the fire in the leased building did work such destruction of it as entitled defendants to exercise their reserved right to terminate the lease. When we say that the witnesses testifying on the trial are numbered by scores and the abstracts of record alone fill seven hundred printed pages, it is sufficiently manifest that anything more than a general survey of the showing made is impossible within the allowable limits of this opinion. However simple may be the statement of the central fact proposition in controversy, the record demonstrates that there is ample room for wide diversity of opinion. As to mere surface facts and indications, the ordinary casual observer may speak with some degree of exactness, and photographs (of which the record contains a large number) may reproduce the picture as it appears to the eye of the living witness, but where the destruction is anything less than absolute, the question whether the injury which the building has sustained is of such vital character as to render its repair impracticable or unwise depends more or less upon conditions not readily apparent to an unskilled person. Such situation naturally suggests the use of builders, contractors, architects and members of allied crafts as expert witnesses, and both parties have sought to fortify their positions by witnesses of this kind. As is not unusual, there is a babel of contradiction in the observations of these experts and the conclusions drawn therefrom.

But, making due allowance for the most extreme and apparently partisan views, we think the following facts are fairly well established: The fire originated somewhere in the central portion of the building, and was under way for several hours after its discovery before it was finally suppressed. In a large section of the building the flames had eaten their way from the basement to the top, and in this section all of the several floors and the roof were entirely consumed or had fallen into the basement. In other sec-

tions the floors had not fallen in, and the partitions between the rooms were left standing. In many of the rooms the woodwork was burned off or badly charred. All were discolored by smoke, and more or less injury was apparent from the water used in suppressing the fire. The flames did not come in direct contact with the outer walls, but there is evidence tending to show that they were in places at least subjected to great heat. The water which was poured into the building during the fire gathered in the basement, and softened the earth about the foundation walls. The brick in the walls were to some extent "spawled" by the heat, and the cohesive strength of the mortar in which the brick were laid was injuriously affected. There were numerous cracks in the walls on the east and north sides, both of which bordered upon the public street. These walls were to some extent "out of plumb," and the city council took action condemning them as a menace to public safety. A separation appeared to be taking place between the outer walls and the cross or partition walls dividing the interior of the building. The cost of constructing a new building of the same general class on the same site is estimated at from $45,000 to $55,000, while the cost of restoring the old building incorporating therein the old walls and the unconsumed part of the original structure is estimated at from $27,000 to $47,000. No part of the original building was left in a habitable or tenantable condition. The insurance companies carrying the risk paid thereon as for total loss the sum of $45,000, waiving their option to rebuild. It is true the plaintiff's witnesses contest many of these propositions, and state facts tending to show the injury to the building to be less serious and extensive than we have described it, but we think the clear preponderance of the evidence supports our conclusion. We are satisfied that the building was substantially destroyed for all practical purposes, and had so far lost its identity that, if restored or repaired with reasonable care for its

stability and safety, the resulting structure would have been in all reasonable intents a new building. Such being the case, an affirmance of the decree of the trial court necessarily follows.

II. Counsel have argued the question whether plaintiff's right of action, if any, is not at law instead of in equity. They have also discussed the proper measure of damages to be applied in case a recovery is awarded, but, in view of our conclusion already announced, no decision upon these points is called for.

The decree appealed from is therefore *affirmed*.